IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JESUS PATINO, a minor, etc.,           )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )    No.   07 C 6744
                                       )
MICHAEL J. ASTRUE, Commissioner        )
of the Social Security                 )
Administration,                        )
                                       )
                    Defendant.         )

## MEMORANDUM OPINION AND ORDER

Minor Jesus Patino ("Patino"), by his mother and next friend Maria Cabrera ("Cabrera"), seeks judicial review pursuant to Social Security Act ("Act") §405(g) of the final decision of Commissioner of Social Security Michael J. Astrue ("Commissioner") that denied Patino's claim for supplemental security income ("SSI") disability benefits.[1] Both sides have moved for summary judgment under Fed. R. Civ. P. ("Rule") 56, and Patino has alternatively moved to remand for further proceedings. For the reasons stated here both Rule 56 motions are denied, but Patino's alternative motion to remand is granted.

---

[1] All further statutory references will take the form "Section-," using the Title 42 numbering (as the text has done) rather than the Act's internal numbering. All portions of 20 C.F.R. are cited "Reg. §--." Citations to Patino's and Commissioner's memoranda take the respective forms "P. Mem. --" and "Comm. Mem. --," while Patino's reply memorandum is cited "P. R. Mem. --."

## Procedural Background[2]

On August 30, 2000 Cabrera filed an application for SSI benefits on Patino's behalf, stating that since January 1, 1992 he has suffered from asthma and a foot deformity and--evidenced later--a learning disorder (R. 71-75, 79, 89, 97). That application was initially denied on March 8, 2001, and upon reconsideration it was again denied on July 26, 2001 (R. 32-37; 42-45). Invoking his right to further review, Patino requested and received a hearing ("Hearing") on May 24, 2006 before Administrative Law Judge ("ALJ") Percival Harmon (R. 608).[3] Represented by counsel, Patino testified during the Hearing, as did Cabrera and Dr. Ellen Rozenfeld ("Rozenfeld"),[4] a licensed clinical psychologist and certified school psychologist (R. 410-12).

ALJ Harmon's September 29, 2006 decision concluded that Patino was not disabled within the meaning of the relevant

---

[2]    What follows in the next sections of the text is drawn from the administrative record, cited "R. --."

[3]    Patino's case appears to have been prematurely dismissed in an earlier proceeding before an ALJ (R. 26). That April 26, 2004 dismissal was vacated by the Appeals Council via an August 13, 2004 order that also remanded Patino's case to ALJ Harmon (id.).

[4]    Because neither Rozenfeld nor Dr. Hector Machabanski ("Machabanski," a Ph.D. referred to later) possessed an M.D. degree, this opinion refers to each of them simply by last name--not to denigrate their degrees, but to distinguish them from medical practitioners.

statutes and regulations and was thus ineligible for SSI disability benefits (R. 26-31).[5] That decision became Commissioner's once the Appeals Council denied Patino's request for review on October 3, 2007 (R. 7-9). On November 30, 2007 Patino filed a timely complaint for judicial review.

## Factual Background

Patino was born on September 17, 1991 and was thus, at the time of his hearing before the ALJ, 14 years old, enrolled in the eighth grade and scheduled to begin high school that fall (R. 615). Patino had previously been diagnosed with asthma and various foot-related problems that had required surgery, physical therapy and prescriptions for an arch support and orthotics (R. 178-227, 236-44). Patino also had an extensive history of speech and language impairments and had been diagnosed with a learning disability (see, e.g., R. 467, 484).[6]

With that general background in place, Patino's school history is next reviewed more thoroughly. That discussion will be followed by a summary of testimony presented at the Hearing, as well as a summary of ALJ Harmon's decision.

---

[5] Further details as to ALJ Harmon's decision will be discussed hereafter.

[6] Patino does not argue that ALJ Harmon erred when evaluating his physical limitations. This opinion will therefore focus its later analysis on the ALJ's assessment of Patino's speech and language impairments and his learning disability.

3

***Patino's School Record***

Patino's educational history is marked by numerous academic and behavioral difficulties. As a second grader during the 1999-2000 academic year Patino earned failing grades and, according to his teacher at the time, worked only at a kindergarten level (R. 170-73). Compelled to repeat the second grade, Patino fared no better the second time around. In October 2000 Patino's teacher reported that he had problems with language and walking and that he had difficulty paying attention, concentrating and completing "on-task behavior" (R. 256-57). She also reported that Patino was able to finish his work on time only when she would sit next to him and help him work through the assignment (id.). Furthermore, although his teacher noted that Patino was able to follow directions, comply with class rules and adjust to new situations, she added that his speech was unclear and difficult to understand, that he talked too much and that he had problems walking and standing for long periods of time (R. 257-58).

Evaluations and assessments from the following academic year reconfirmed the existence of many of Patino's difficulties. For example, Patino's poor vocabulary and weak articulation and auditory skills were noted on a November 2000 Speech-Language Assessment as well as in a January 2001 Individualized Educational Program ("IEP") (R. 131, 133-36). Following the issuance of that IEP, Patino began receiving speech pathology

4

instruction for 45 minutes every week (R. 125-128).

In January 2001 Machabanski evaluated Patino at the request of the Bureau of Disability Determination Services of Illinois' Department of Human Services (R. 264). Machabanski reported that Patino "communicated in Spanish," "demonstrated some minor articulation difficulties" and "appeared to have word finding difficulties" (R. 265). Machabanski also determined that Patino had an IQ score of 96, considered to be in the average range of intellectual functioning, and he concluded that Patino had "average nonverbal intellectual abilities" (id.).

In the 2001-02 academic year Patino's reading, writing and spelling skills were all deemed poor (R. 316). Even though he was enrolled in the third grade at the time, he spelled at a first-grade level and read at a second-grade level (according to standardized test results, he performed at the 10th percentile in reading and the 7th percentile in language) (R. 317, 334). Patino's speech pathologist seemed to provide the only bright spot in his academic record, noting that Patino was making good progress in their ongoing sessions (R. 308-13, 336).

By March 2003 it was determined that Patino had a learning disability, one that explained his delayed speech and language development as well as his poor academic record (R. 467, 484). Further evidence of his difficulties emerged from his performance on the Kaufman Test of Educational Achievement, a test Patino

5

took during the 2002-03 academic year when he was 11 (R. 483-84).
There Patino performed at the 1.9 grade level equivalent in
"reading decoding" and spelling and at less than a 1.0 grade
level equivalent in reading comprehension (id.). During that
same time frame Patino was placed in a special education class
for 1,400 (out of a possible 1,500) minutes every week (R. 475).
In addition he was specially accommodated in the classroom,
including having directions repeated to him for added
clarification, being presented with concrete examples, receiving
extra time to complete tasks, being tested on a lower level and
being graded according to modified criteria (R. 469, 478).

Those conditions did not change during the 2003-04 academic
year, when Patino found himself in the fifth grade but capable of
reading only at a third grade level (R. 443-44, 449). On
standardized testing that year, Patino scored in the 1st
percentile and 1st stanine in reading and in the 10th percentile
and 2nd stanine in mathematics (R. 444). He continued to be
diagnosed with a learning disability and speech and language
impairments, and he continued to require the same classroom
modifications referred to in the last paragraph. Patino's time
in special education also increased--from 1,400 to 1,445 minutes
every week (R. 453).

Patino showed only minimal improvement during the 2004-05
school year, when he was enrolled in the sixth grade (R. 364).

6

To be sure, at one point during the latter half of that year
Patino's teacher noted that his behavior had greatly improved and
that he was an overall good student (R. 436-37). But the fact
remained that standardized tests showed Patino to be reading at
the 1st percentile and 1st stanine, in addition to which he
continued to have a learning disability and to exhibit speech and
language impairments (R. 365-66). Patino's time in special
education now numbered 1,230 minutes every week, and he spent 30
additional minutes every week with his speech pathologist (R.
374). His IEP summary sheet continued to report that Patino had
difficulty following directions, was easily distracted and had a
short auditory span (R. 379). And although he earned grades of
As, Bs and Cs during that year, Patino earned those marks while
working through a "significantly modified curriculum" (R. 434).

In the 2005-06 academic year, when Patino was 14 years old,
he was placed in the eighth grade (R. 491, 637). His progress at
that point remained somewhat of a mixed bag. Although Patino had
shown some academic improvement, he still remained below his
grade-level in all subjects--in particular he continued to score
at the 1st percentile (or second-grade level) in both reading and
spelling (R. 492, 505). And although Patino was being
"mainstreamed" into more regular classes, he still required
certain accommodations in the classroom and still spent 815
minutes of every week in special education, with 515 of those

7

minutes spent in language arts instruction (R. 500, 572, 577).
On the other hand, even though Patino's IEP that year again noted
that he had a learning disability and needed specialized
instruction in multiple academic subjects, that IEP (unlike its
predecessors) made no mention of a speech or language impairment
(R. 493 -94). Finally, his report card shows that Patino earned
mostly Bs, Cs and Ds that year, although those grades still
reflected modified class work (R. 501-02, 505, 588-89).

## Testimony at the Hearing

At the Hearing ALJ Harmon heard testimony from three people:
Patino, Cabrera and Rozenfeld. Summaries of their testimony
follow.

Patino spoke about his life both at school and at home. As
to the former Patino explained that he could read and write "a
little bit," generally with some assistance, and that he was able
to do basic math (R. 614, 625). Patino said that although his
grades had been poor the last semester, they had improved during
the current semester because he had made more of an effort (R.
625). He testified that he received special education to assist
with his speech and language problems, that he had friends at
school and that he participated in gym class except to the extent
that running was involved, as that activity caused pain in his
feet (R. 614-18). In addition Patino told ALJ Harmon that he
generally obeyed the rules at school (R. 618). Patino said that

8

at home he watched baseball, saw movies with friends, played video games and rode his bike (R. 616, 620-21, 624-25). He also did chores, was able to ready himself for school in the mornings, could use the phone and could take messages for his mother (R. 621-22).

Cabrera's testimony generally corroborated her son's. She testified that Patino needed significant assistance to read (R. 631) and that his grades were poor (R. 632), but that he worked on his homework independently, could get dressed on his own and could do some chores around the house (R. 628-30). She also stated that Patino would be enrolled in special education classes in high school, a plan that made him "very nervous" because he did not want to be singled out at his new school (R. 630-31).

Rozenfeld, who testified last at the hearing, provided an extensive review of the medical and school information contained in Patino's file and concluded that it established that Patino had a "pretty significant learning disability" (R. 633). Rozenfeld added that a dearth of quantitative information in the record prevented her from pinpointing the precise severity of Patino's disability (R. 633-34). Still she testified that Patino's condition did not meet or equal one of the medical impairments listed as part of the relevant federal regulations (R. 634).

At the end of her testimony Rozenfeld concluded that Patino

had a "marked limitation" in the domain of "acquiring and using information," adding that his could not be an "extreme limitation" because his reading and spelling scores did not fall greater than three standard deviations below the mean (R. 635).[7] But Rozenfeld later testified that it was "extreme" for a 14-year-old to be reading and writing at the second-grade level and that as Patino grew older his test scores would likely drop even further, thus possibly placing him at that point in time in the "extreme range" of non-functioning (R. 649-50).

As for the domain of "attending and completing tasks," Rozenfeld testified that Patino had "less than a marked limitation" (R. 636). Although some of Patino's IEPs noted that he had a problem paying attention in the classroom, Rozenfeld explained that other IEPs--and in particular Patino's most recent one--had not indicated that was an issue (R. 636). That discrepancy, Rozenfeld explained, suggested that Patino's difficulties with "attending and completing tasks" were episodic rather than persistent (R. 645).

Finally Rozenfeld testified that Patino faced no limitations in the areas of "interacting and relating with others" and "caring for oneself" (R. 635-38). And she offered no opinion

_____

[7] Statutory definitions of "extreme" versus "marked" limitations, as well as a more contextualized discussion of the six "domains of functioning," which are relevant to determining whether a child claimant is eligible for SSI disability benefits, will be set out later.

regarding Patino's abilities in the domains of "moving about and manipulating objects" and "health and physical well-being," as both were "outside [her] area of expertise" (R. 638).

## ALJ Harmon's Decision

ALJ Harmon found that Patino "had not engaged in substantial gainful activity since the alleged onset date [January 1, 1992]" and that he had a "severe" impairment within the meaning of Reg. §416.924(b) (R. 30). ALJ Harmon also found that Patino's "asthma, history of bilateral osteotomies for flat foot and speech and language impairment do not meet or medically equal the severity of the impairment listed in" the relevant regulations (R. 28, 31).

Next, as to the six domains of functioning, ALJ Harmon found that Patino had a "marked" limitation with respect to "acquiring and using information," a "less than marked" limitation as to attending and completing tasks" and "moving about and manipulating objects" and "no limitation" regarding the three remaining domains: "interacting and relating with others," "self care" and "health and physical well-being" (R. 30). ALJ Harmon thus concluded that Patino was ineligible for SSI disability benefits because he "does not have an 'extreme' limitation in any domain of functioning, a 'marked' limitation in two domains of functioning, and does not functionally equal the severity of the listings" included in the regulations. Hence it followed that he

11

"has not been under a 'disability[ ]' at any time from the alleged onset date through the date of this decision" (R. 31).

## Standard of Review and Applicable Law

Any decision by the Commissioner will be upheld on judicial review under Section 405(g) "if it is supported by substantial evidence and is free of legal error" (Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002)). Such review is therefore limited to determining (1) whether Commissioner applied the correct legal standard in reaching the decision and (2) whether there is substantial evidence in the record to support the findings (Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000)).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (Kepple v. Massanari, 268 F.3d 513, 516 (7th Cir. 2001), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)(internal quotation marks omitted)). In reviewing Commissioner's determination this Court must look at the entire administrative record, but it may "not reweigh the evidence, resolve conflicts, decide questions of credibility or substitute [its] own judgment for that of the Commissioner" (Clifford, 227 F.3d at 869). Still, more is called for than an uncritical rubber-stamping of Commissioner's decision (id.).

To be found disabled under the applicable regulations, a child must meet or equal (either medically or functionally) the

12

requirements of an impairment listed in App. 1 (Reg.
§416.924(a)). Those regulations create a three-step analysis for
evaluating a child's impairment and determining disability:

    1. First Commissioner must look to whether the child
was performing substantial gainful activity (Reg.
§416.924(b)).

    2. If the child was not, Commissioner must next
determine whether the child has a severe impairment or
combination of impairments (Reg. §416.924(c)).

    3. If the answer at step two is "yes," the final step
is to determine whether the impairment meets or equals an
impairment listed in App. 1 (Reg. §416.924(d)). If so, the
child is disabled (Reg. §416.924(d)(1)). If not, all of the
listings must be considered to decide whether the child's
functional limitations are equal in severity to the
functional limitations in any listing (Reg. §416.926a(a)).
That degree of severity requires that the child have marked
limitations in two domains of functioning or an extreme
limitation in one domain (id.). If Commissioner finds the
child meets either standard, the child is disabled.

"Marked" limitations are impairments that "interfere[ ]
seriously with your ability to independently initiate, sustain,
or complete activities," while "extreme" limitations occur with
impairments that "interfere[ ] very seriously with your ability

13

to independently initiate, sustain, or complete activities" (Reg. §§416.926a(e)(2)-(3)). Domains of functioning are (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself and (6) health and physical well-being (Reg. §416.926a(b)(1)).

**Remand Is Necessary To Fill Gaps in the ALJ's Decision**

Patino objects to ALJ Harmon's decision on four grounds. First, he argues, the decision failed to consider Rozenfeld's testimony fully (P. Mem. 11). Second, he contends, the ALJ erred because he did not supplement the record as needed (id. at 12-13). Third, Patino points to the ALJ's failure to consider fully both Patino's and Cabrera's testimony and the ALJ's failure to provide sufficient credibility determinations (id. at 13). Finally, Patino urges, the ALJ erred by ignoring critical evidence and by failing to link logically all the evidence in the record to his conclusion (id. at 14). Those contentions are discussed in turn to make clear what must occur as part of the necessary remand.

*Rozenfeld's Testimony*

First, Patino correctly contends that ALJ Harmon failed to consider Rozenfeld's testimony sufficiently. ALJ Harmon's opinion refers briefly to "medical expert testimony" (R. 28) and, even more generically, speaks of "consider[ing] all of the

14

evidence of the record, including the medical records and other evidence" as well as "testimony show[ing] that claimant has a severe learning disability in reading" (R. 30). But the ALJ never refers to Rozenfeld by name or, more importantly, discusses her substantial testimony at any length. That cursory treatment of Rozenfeld's testimony is particularly problematic, given her conflicting statements as to whether Patino showed an "extreme" versus "marked" limitation in the domain of "acquiring and using information"--a distinction that would alone make the difference between Patino's eligibility and ineligibility for SSI disability benefits (see Reg. §§416.924(d), §416.926a(a)).

As explained earlier, Rozenfeld initially testified that Patino's limitation in that area was "marked" rather than "extreme" (R. 635). But as the end of the hearing drew near--and as ALJ Harmon and Patino's attorney discussed whether the record and testimony actually supported a finding of an "extreme" limitation in that same domain--Rozenfeld again chimed in on the subject (R. 649-50 (emphases added)):

Can I say one thing?....He is still functioning at a
second grade level. He has consistently been
functioning at a late second grade level, probably for
the last three years. So there's really been minimal
progress....As he gets older, my assumption is he's not
going to make any great strides; he would have already
made them in a smaller middle school environment rather
than in a large high school environment. The standard
scores are based on age. As he gets older, the
standard scores will most likely drop, which would make
it possible [to be in] the extreme range at that
point....For someone who is 14 functioning reading and

15

> writing at a second grade level, that certainly sounds extreme.

> *     *     *

> Yeah, I mean <u>I understand that the numbers right now are not three standard deviations below the mean. To be honest with you, they most likely will get there.</u> As he gets older and as he's then compared against...13 and 14 year olds.

That testimony appears to indicate that Rozenfeld vacillated on her earlier stance that Patino's limitation with respect to "acquiring and using information" was merely "marked" rather than "extreme." True, nothing in those statements necessarily amounts to an unequivocal switching of Rozenfeld's initial conclusion. But it is also clear that she is providing ALJ Harmon a more complete exegesis on the issue.

Yet the ALJ did not address Rozenfeld's testimony on that score--or really, any part of the Rozenfeld testimony--when rendering his finding about the degree to which Patino was limited in the domain of "acquiring and using information." Instead he simply wrote (R. 30 (internal citations omitted)):

> Records and testimony show that claimant has a severe learning disability in reading. He is essentially illiterate although he can read "a little bit." He also has been deemed eligible for Special Education Services. However, he performed well on intelligence testing and his most recent grade report was good. I therefore find marked limitations in the domain of acquiring and using information but I don't consider them "extreme."

Over and above the ALJ's seemingly disproportionate reliance on Patino's average IQ score of 96 (to which this Court assumes

16

he must have been referring when he spoke of "intelligence
testing")--and, perhaps more importantly, the ALJ's peculiarly
narrow focus on a single positive grade report (as opposed to
considering the years of failing marks that Patino had
accumulated)--this Court is especially troubled by the fact that
the ALJ makes no mention of Rozenfeld's extensive testimony on
the "extreme" versus "marked" nature of Patino's limitation.
Given what hinged on that one finding, at least some treatment of
Rozenfeld's testimony should have been expected.

Our Court of Appeals has "consistently recognize[d] that
meaningful appellate review requires the ALJ to articulate
reasons for accepting or rejecting entire lines of evidence"
(Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994)). And
"[a]lthough a written evaluation of each piece of evidence or
testimony is not required, neither may the ALJ select and discuss
only that evidence that favors his ultimate conclusion" (id.
(internal citation omitted)). Instead "the ALJ's decision must
be based upon consideration of all the relevant evidence," and
"the ALJ must articulate at some minimal level his analysis of
the evidence" (id. (internal quotation marks omitted)); see also
Murphy v. Astrue, 496 F.3d 630, 634 (7th Cir. 2007), holding that
an ALJ must "explain why he gave no weight to portions of the
[record]").

Because ALJ Harmon has failed to meet the requisite standard

17

of articulation and explanation--most notably by ignoring
Rozenfeld's testimony, but also by his apparent failure to
consider Patino's consistently poor performance in reading and
spelling as indicated both in his past grade reports and in his
standardized testing results--this Court has no choice but to
vacate and remand his decision. On remand a new decision must
address both Rozenfeld's testimony and Patino's complete academic
record more fully, as part of any analysis that determines
whether Patino's limitation in the domain of acquiring and using
information is extreme or marked.

## *Two Additional Errors Must Be Corrected on Remand*

On remand two other errors, both apparent from the text of
ALJ Harmon's decision, must be corrected as well. This opinion
turns next to those deficiencies.

First, as Patino argues, ALJ Harmon failed to develop a
complete record despite testimony from Rozenfeld pointing to
several critical gaps in the evidence before her. For example,
Rozenfeld testified that the record surrounding Patino's fifth
grade reading comprehension score was incomplete, for that score
represented "a single score, [a] single point in time"--partly
because no reading comprehension had ever been repeated and
partly because she did not know whether Patino hd been compared
"against grade norms or against age norms"--i.e., students who
were the same age as Patino or students who were merely enrolled

18

in the same grade level (R. 641-42).[8]  And she pointed to a
similar lack of quantitative information about Patino's speech
and language abilities (R. 633-34):

> [T]he problem with that impairment is that there's no
> quantitative information at all in the file.  There's a
> narrative indicating he has problems with receptive and
> expressive skills, but there's no, there's no scores,
> so I don't know how severe the problems are.

Rozenfeld further noted that she also lacked complete
information--this time both quantitative and qualitative--as to
Patino's ability to read, pay attention and concentrate (R. 642).
For instance, when asked by Patino's lawyer to comment on a
particular exhibit that stated Patino "forgets a lot," but did
not specify just what Patino forgot--Rozenfeld responded (id.):

What is he forgetting?

\*       \*       \*

> I mean, is he forgetting what he reads, because he
> can't read it?  I'm not quite sure what that refers to.
> The problem, this is a very thick record.  The problem
> is there's very little quantitative information.  There
> is, even from the school, you know, most recently in
> '06 they report IQ scores, but there's no narrative as
> to issues, you know, relating to attention,
> concentration.

Although social security disability claimants do bear the
burden of proving their disabilities (Smith v. Apfel, 231 F.3d
433, 437 (7th Cir. 2000)), it is an equally "well-settled

---

[8]    That distinction matters because Patino had been retained
in the second grade and was therefore older than other students
in his grade.

19

proposition regarding social security disability hearings...that
[i]t is a basic obligation of the  ALJ to develop a full and fair
record" (Thompson v. Sullivan, 933 F.3d 581, 585 (7th Cir.
1991)(alteration in original, internal quotation marks omitted)).
To be sure, that duty is especially compelling in cases, unlike
the one presented here, where the claimant is unrepresented by
counsel at his hearing (id.).  Still, the basic obligation
persists across all social security cases, and a "[f]ailure to
fulfill this obligation is 'good cause' to remand for gathering
of additional evidence" (Smith, 231 F.3d at 437).

        Such a failure is apparent here.  As a result, upon remand a
more thorough record--one that fills the gaps that Rozenfeld has
already identified--must be developed and relied upon when re-
assessing Patino's claim.  And Rozenfeld's testimony that a lack
of quantitative information would not "materially change" her
verdict that Patino has "a significant learning disorder" does
not alter this mandate (R. 633-34).  To conclude that Patino has
a learning disorder is not the same as determining whether
Patino's limitations across six distinct domains are "extreme,"
"marked," "less than marked" or non-existent."  It is those
latter conclusions that matter when evaluating whether a claimant
qualifies for benefits.  Furthermore, that a witness is capable
of rendering an opinion based on incomplete information does not
mean that the missing information remains insignificant.

To be sure, <u>Flener ex rel. Flener v. Barnhart</u>, 361 F.3d 442, 448 (7th Cir. 2004) reminds us that "because it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected." Here, however, it is clear that filling the gaps in the record that were noted by Rozenfeld herself would have far better informed the ALJ's findings as to the extent of Patino's limitations in each of the six domains--particularly in the areas of "acquiring and using information" and "attending and completing tasks," although perhaps in other areas as well.[9] Hence appropriate efforts to develop the record further must be undertaken on remand.

Finally, more complete credibility determinations must also be provided on remand. As the decision now stands, ALJ Harmon has simply written (R. 31):

> The child's subjective complaints are considered credible only to the extent they are supported by the evidence of record as summarized in the text of this decision.

---

[9] Commissioner argues that because Patino "does not specifically allege that he had 'marked' or 'extreme' limitations in any of the domains other than 'acquiring and using information' and 'attending and completing tasks,'" he has waived the right to raise any such argument and presumably to have his limitations in the other four domains of functioning re-assessed on remand (Comm. Mem. 14). But Patino did address other domains of functioning in his initial brief (see, e.g., P. Mem. 13) as well as in his reply brief (see, e.g., P. R. Mem. 4). So to the extent that any new information bears on Patino's limitations in any of the six domains of functioning, his earlier-determined limitation in that domain must be reconsidered.

And no mention at all is made of Cabrera's or Rozenfeld's

credibility.  That falls far short of the standard that Giles ex

rel. Giles v. Astrue, 483 F.3d 483, 488 (7th Cir. 2007) quotes

from SSR 96-7P, 1996 WL 374186, at *4 (S.S.A. July 2, 1996):

> The reasons for the credibility finding must be
> grounded in the evidence and articulated in the
> determination or decision.  It is not sufficient to
> make a conclusory statement that "the individual's
> allegations have been considered" or that "the
> allegations are (or are not) credible."  The
> determination or decision must contain specific reasons
> for the finding on credibility, supported by the
> evidence in the case record, and must be sufficiently
> specific to make clear to the individual and to any
> subsequent reviewers the weight the adjudicator gave to
> the individual's statements and the reasons for that
> weight.

In sum, on remand it will be necessary to provide a more

particularized credibility determination as to Patino's

testimony, as well as such determinations for Cabrera and

Rozenfeld.

### One Non-issue on Remand

Patino has raised one other objection to ALJ Harmon's

decision, arguing that he failed "to build a logical bridge

between the evidence and the result" (P. Mem. 14; P. R. Mem. 9).

Patino seeks to bolster that contention (1) by pointing to

evidence that Patino was graded under significantly modified

criteria (id. at 14; id.), evidence that he contends should have

led ALJ Harmon to a finding that Patino had an "extreme" rather

than a merely "marked" limitation in the domain of "acquiring and

22

using information" (id. at 14-15; id.), and (2) by criticizing
the ALJ for crediting an average IQ score as part of his
decision, because "intelligence and learning disabilities
are...two different concepts" (id.).

To be sure, an ALJ must "provide a rational basis for the
denial of benefits" (Green v. Apfel, 204 F.3d 780, 781 (7th Cir.
2000)), and "the ALJ's decision must be based upon consideration
of all the relevant evidence" (Herron, 19 F.3d at 333). But it
is equally true that "a written evaluation of each piece of
evidence or testimony is not required" (id.) and that judicial
review is limited to looking for "substantial evidence"--a term
defined earlier in this opinion.

Under those standards it would be inappropriate to vacate
ALJ Harmon's decision on the bases discussed in this section.
That would invade the forbidden areas of this Court's
"reweigh[ing] evidence" and "substitut[ing] its own judgment for
Commissioner's" (Clifford, 227 F.3d at 869). Instead the
earlier-discussed remand issues should be enough to produce a
stronger link between the evidence and the ALJ's new decision.

## Conclusion

Because neither party is entitled to a judgment as a matter
of law, their cross-motions for summary judgment are denied.
Instead the denial of Patino's SSI claim is reversed, and
Patino's alternative motion to remand is granted under sentence

23

four of Section 405(g) (see Melkonyan v. Sullivan, 501 U.S. 89, 97-102 (1991)) for:

1.  a more sufficient consideration of Rozenfeld's complete testimony--particularly that regarding the "extreme" versus "marked" nature of Patino's limitation in the domain of "acquiring and using" information--as well as a more sufficient consideration of Patino's history of poor grade reports and standardized test results;

2.  further development of the record, with particular attention to the evidentiary gaps noted by Rozenfeld; and

3.  a more comprehensive credibility determination as to Patino's testimony and comparable credibility determinations as to Cabrera's and Rozenfeld's testimony, which were omitted from the ALJ's current decision.

Given the nature of the factors that have led to the remand, there is obviously room for concern as to returning the case for a new look by the same ALJ. As our Court of Appeals has done in such cases as Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003)(per curiam), this Court therefore urges that Commissioner exercise his discretion in favor of referring the case to a new ALJ because of the "legitimate and compelling reason[s]" disclosed here (the quoted language derives from Travis v. Sullivan, 985 F.2d 919, 924 (7th Cir. 1993)).

One last matter bears mention--a matter that the parties

24

have had no occasion to consider until now. Because this opinion

calls for a sentence four remand, the potential for an award of

attorney's fees under the Equal Access to Justice Act is

controlled by the decision in <u>Shalala v. Schaefer</u>, 509 U.S. 292

(1993). This is noted solely as a procedural matter--this Court

expresses no substantive view on the subject of an award vel

non.[10]

_____
Milton I. Shadur
Senior United States District Judge

Date: September 4, 2008

_____

[10] Once again this Court opts for publishing this opinion
in what might be thought of (other than by the litigants, of
course) as an otherwise pedestrian case. That election has been
made to provide this Court with the opportunity for public
acknowledgment of the outstanding work that has always been done
by its outgoing law clerk Georgia Alexakis during the year now
ending. Some better appreciation of the extraordinary quality of
Georgia's work can be gained by reading this Court's majority
opinion for the panel in <u>Guidiville Band of Pomo Indians v. NGV
Gaming, Ltd.</u>, 531 F.3d 767 (9th Cir. 2008) and its opinion in
<u>Whiting v. Harley-Davidson Fin. Servs.</u>, 534 F.Supp.2d 823 (N.D.
Ill. 2008), in each of which cases (as always) her research and
analysis provided substantial value beyond that furnished by the
counsel in the case. This Court hastens to add (as it invariably
does when it is appropriate to pay such a tribute to one of its
exemplary law clerks) that it has carefully reworked each
sentence in this and other draft opinions produced by Georgia, as
well as having read each cited case, so that each end product is
this Court's own. If then any errors have found their way into
any final version, the sole responsibility must be laid at this
Court's doorstep and not Georgia's.

25